UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TAMMY D. O'SULLIVAN,

                        Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
_____

DECISION & ORDER

18-CV-0763MWP

## **PRELIMINARY STATEMENT**

        Plaintiff Tammy D. O'Sullivan ("O'Sullivan") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 1, 2018, this case has been assigned to, and the parties have consented to the disposition of this case by, the undersigned. (Docket # 14).

        Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 7, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and O'Sullivan's motion for judgment on the pleadings is denied.

## **DISCUSSION**

### I.     **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform his or her past work; and

(5) if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## II.     O'Sullivan's Contentions

O'Sullivan contends that the ALJ's determination that she is not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 7-1, 12). First, O'Sullivan maintains that the ALJ's mental RFC determination is not supported by substantial evidence because the ALJ failed to account for the stress limitations assessed by state consulting psychologists Janine Ippolito ("Ippolito"), Psy. D., and M. Totin ("Totin"). (Docket ## 7-1 at 14-17; 12 at 1-5). Next, O'Sullivan challenges the ALJ's physical RFC determination on the grounds the she relied upon a stale opinion issued by state consulting physician Samuel Balderman ("Balderman"), MD, and otherwise formulated an RFC based upon her own lay opinion of O'Sullivan's functional capacity. (Docket ## 7-1 at 18-21; 5-7).

## III.    Analysis

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities

4

on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

### A. Mental RFC Assessment

I turn first to O'Sullivan's contention that the ALJ's mental RFC assessment was flawed because the ALJ failed to account for the stress limitations assessed by Ippolito and Totin. (Docket ## 7-1 at 14-17; 12 at 1-5 ). Ippolito conducted a psychiatric evaluation of O'Sullivan on October 9, 2014. (Tr. 324-28).[1] Ippolito noted that O'Sullivan had not received inpatient psychiatric treatment and was not currently receiving outpatient mental health treatment. (*Id.*). O'Sullivan reported difficulty sleeping, a fluctuating appetite, depressive symptoms, including sad mood, tearfulness, and feeling "gloomy," anxiety-related symptoms, including excessive apprehension, worry, nervousness, and anxiety when around unfamiliar people or places, panic attacks, characterized by heart palpitations, nausea, and sweating, obsessive compulsive traits, including keeping things neat and orderly, and concentration difficulties. (*Id.*).

On mental status examination, O'Sullivan appeared well-groomed and exhibited appropriate eye contact, but her posture was tense and motor behavior was restless. (*Id.*). Her speech was fluent and clear, and her thought process was coherent and goal-directed. (*Id.*). O'Sullivan's affect was anxious, and her mood was dysthymic, yet she was oriented, and had

---

[1] The administrative transcript (Docket # 5) shall be referred to as "Tr. ___," and references thereto utilize the internal Bates-stamped pagination assigned by the parties.

intact attention, concentration, and memory skills. (*Id.*). She had average cognitive functioning and fair to good insight and judgment. (*Id.*).

O'Sullivan reported that she was able to cook, clean, wash laundry, grocery shop, and care for her personal hygiene, although she sometimes needed assistance with these tasks due to pain and numbness. (*Id.*). She could not take public transportation because of her anxiety, but was able to drive short distances. (*Id.*). She reported that she occasionally conversed with friends, her sister and her children, and spent her days watching television and completing household chores. (*Id.*).

In her medical source statement, Ippolito found that O'Sullivan was capable of understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, learning new tasks, performing complex tasks independently, and making appropriate decisions with "no evidence of limitations." (*Id.*). According to Ippolito, O'Sullivan's ability to maintain a regular schedule was mildly limited and her ability to relate adequately with others was moderately limited. (*Id.*). Ippolito opined that O'Sullivan had moderate to marked limitations appropriately dealing with stress. (*Id.*). Ippolito further stated that the results of the evaluation "appear[ed] to be consistent with psychiatric problems, but in itself, this d[id] not appear to be significant enough to interfere with [O'Sullivan's] ability to function on a daily basis" and that O'Sullivan's prognosis was "fair to guarded" due to her lack of mental health treatment but would likely improve with further psychiatric intervention. (*Id.*). Ippolito recommended that O'Sullivan be referred for vocational training and rehabilitation. (*Id.*).

On October 31, 2014, Totin completed a psychiatric review technique relating to O'Sullivan and concluded that she suffered from mild limitations in her ability to engage in

activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, and pace. (Tr. 86). Totin also completed a mental RFC assessment relating to O'Sullivan and opined that she suffered from moderate limitations in her ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. (Tr. 89-90). Totin concluded that O'Sullivan was capable of performing job tasks in a low contact, low stress working environment. (Tr. 87).

O'Sullivan argues that the ALJ erred by failing to account for the stress limitations identified by Ippolito and Totin. (Docket ## 7-1 at 14-17; 12 at 1-5). I disagree. "[W]hen determining whether mentally impaired individuals will be able to adapt to the stress-related demands of the workplace, the ALJ is required to make a thorough, individualized RFC evaluation, focusing on the individual's ability 'to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.'" *Reyes v. Colvin*, 2016 WL 56267, *5 (W.D.N.Y. 2016) (quoting Social Security Ruling "SSR" 85-15, 1985 WL 56857, *4 (1985)). Nevertheless, "even without explicitly referencing a stress limitation, an RFC determination may adequately account for a claimant's stress-related limitations." *Herb v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 441, 447 (W.D.N.Y. 2019). Having reviewed the ALJ's decision, particularly her RFC assessment, I conclude that the ALJ complied with this requirement.

In formulating the RFC in this case, the ALJ relied upon her in-depth review of O'Sullivan's medical records, as well as the opinions of Ippolito and Totin. Despite opining that

7

O'Sullivan suffered limitations in her ability to maintain a schedule, interact with others, and appropriately deal with stress, Ippolito concluded that O'Sullivan had no limitations in her ability to learn new tasks, perform simple and complex tasks independently, and make appropriate decisions. (Tr. 327). Similarly, despite concluding that O'Sullivan would be best suited to positions involving limited stress and interactions with others, Totin opined that O'Sullivan was capable of performing work-related tasks. (Tr. 87).

The ALJ accorded Ippolito's opinion "significant weight." (Tr. 34). In doing so, she concluded that information contained in records dated after Ippolito's evaluation, including evidence of O'Sullivan's daily gym attendance, ongoing work activity, and daily activities, should be considered when formulating the RFC. (*Id.*). Similarly, she accorded Totin's opinion "some weight," determining that it was generally consistent with the record and Ippolito's opinion, but recognizing that it was rendered by a "non-treating and non-examining source." (*Id.*).

The ALJ's RFC finding explicitly accounted for the limitations identified by O'Sullivan and Totin by limiting O'Sullivan to positions requiring limited interaction with others, including coworkers, supervisors and the public, and involving limited workplace changes. (Tr. 23). In evaluating O'Sullivan's ability to manage stress, the ALJ specifically acknowledged her allegations of difficulty "coping with stress, social anxiety, and agoraphobia," and concluded that a comprehensive review of the record supported the conclusion that these difficulties affected her ability to interact with others and to adapt to workplace changes. (Tr. 33). In reaching this conclusion, the ALJ specifically considered O'Sullivan's lack of mental health treatment, her "intact and active daily activities," and her "ongoing work activity,"

reasoning that this evidence did not support any "greater restrictions" in her RFC.[2] (Tr. 33-34).
I find that the ALJ adequately accounted for O'Sullivan's stress-related limitations as found by
Ippolito and Totin.[3] *See, e.g., Jennifer Lee W. v. Berryhill*, 2019 WL 1243759, *4 (N.D.N.Y.
2019) (ALJ's RFC determination accounted for plaintiff's moderate to marked limitations in
dealing with stress where she could still "follow and understand simple instructions and
directions, . . . maintain a regular schedule, and . . . had moderate limitations in her ability to
relate to others"; "ALJ limited [p]laintiff to routine and repetitive tasks and stated that [p]laintiff
cannot do tasks requiring public contact or more than occasional interactions with coworkers[;]
[c]ourts have routinely held that RFC determinations account for a claimant's stress without
specifically referencing a stress limitation") (quotations omitted); *see also Williams v. Comm'r of
Soc. Sec.*, 2018 WL 4443173, *6 (W.D.N.Y. 2018) ("[i]n his decision, the ALJ discussed [the
consulting psychologist] opinion at length and explicitly acknowledged that [the psychologist]
had assessed that [plaintiff] suffered from significant limitations in her ability to cope with
stress[;] . . . [t]he ALJ reasoned that [the psychologist], despite assessing that [plaintiff] had

---

[2] O'Sullivan contends that Ippolito's conclusion that she had moderate to marked limitations in appropriately dealing with stress is inconsistent with the ALJ's determination that she was not limited to simple, unskilled work. (Docket # 12 at 4 ("the ALJ's RFC determination . . . does not limit [O'Sullivan] to simple or unskilled work")). This contention is at odds with the required analysis, which recognizes that "[b]ecause stress is highly individualized, mentally impaired individuals may have difficulty meeting the requirements of even so-called low-stress jobs, and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect [her] ability to work." *Collins v. Colvin*, 2016 WL 5529424, *3 (W.D.N.Y. 2016) (internal quotations and citations omitted). In this case, the ALJ conducted the requisite individualized assessment and concluded that O'Sullivan's ability "to perform skilled work as an Accounting Clerk at just below substantial gainful activities levels throughout the period under review" was inconsistent with the conclusion that she was limited to unskilled work. (Tr. 34-35).

[3] O'Sullivan also complains that the ALJ failed to adequately explain how she accounted for the stress limitations assessed by Ippolito. (Docket ## 7-1 at 16-17; 12 at 2). I disagree. As explained above, a comprehensive review of the ALJ's decision demonstrates that the ALJ recognized that O'Sullivan suffered from stress-related limitations, but when considering the record as a whole, including O'Sullivan's treatment history (or lack thereof), employment history, and daily activities, she accounted only for those stress-related limitations that she determined ultimately were supported by the record. *See Gladney v. Astrue*, 2014 WL 3557997, *14 (W.D.N.Y. 2014) (ALJ's failure to articulate clearly the basis for his determination was harmless where it was "possible to glean the ALJ's rationale" from a review of the entire decision.

9

difficulty dealing with stress, concluded that she was generally capable of performing simple tasks independently, relating adequately with others, and maintaining attention, concentration and a regular schedule[;] [i]n formulating the RFC, the ALJ thus accounted for [the psychologist's] assessment by limiting [plaintiff] to simple work involving routine tasks"); *Cowley v. Berryhill*, 312 F. Supp. 3d 381, 384 (W.D.N.Y. 2018) ("[w]ith respect to [consultative examiner's] opinion that plaintiff is moderately limited with respect to stress, [the court] find[s] that the ALJ largely accounted for such limitation in her RFC finding[;] [t]he RFC limited plaintiff to simple, unskilled tasks with no more than occasional changes in the work setting and without an hourly, machine-driven assembly line production rate"); *Cosme v. Colvin*, 2016 WL 4154280, *12-13 (W.D.N.Y. 2016) (ALJ's RFC finding adequately accounted for plaintiff's stress-related limitations where ALJ limited plaintiff to "positions involving unskilled work that did not require any contact with coworkers or the public and only limited contact with supervisors") (footnote omitted); *Steffens v. Colvin*, 2015 WL 9217058, *4 (W.D.N.Y. 2015) ("the RFC finding requiring low contact with coworkers and the public adequately accounted for plaintiff's stress").

In sum, I find that the ALJ appropriately accounted for O'Sullivan's stress-based limitations and that remand is not warranted on this basis. *See Reyes v. Colvin*, 2016 WL 56267 at *6 ("although the ALJ did not specifically include stress limitations in his RFC assessment, his reliance on the findings and observations of the consultative medical sources in terms of their consideration of plaintiff's stress-related functional limitations, as well as his comprehensive consideration of the hearing testimony, objective medical evidence, and treating and consultative medical source opinions, represents the kind of thorough, individualized mental RFC evaluation

contemplated by SSR 85-15 and the overall requirements of the Social Security regulations and rulings"). Therefore, I find that remand is not warranted on this ground.

B. **Physical RFC Assessment**

I turn next to O'Sullivan's challenge to the ALJ's physical RFC assessment on the grounds that she improperly relied upon Balderman's opinion. (Docket ## 7-1 at 18-21; 12 at 5-7). Specifically, O'Sullivan maintains that Balderman's opinion was stale due to her subsequent diagnosis of fibromyalgia, rendering the ALJ's reliance upon the opinion improper. (*Id.*). O'Sullivan also maintains that portions of the physical RFC assessment are unsupported by a medical opinion because the ALJ included more significant limitations than those assessed by Balderman. (*Id.*).

At step two of the sequential process, the ALJ found that O'Sullivan had the severe impairments of rheumatoid arthritis, *fibromyalgia*, obesity, anxiety disorder, and affective disorder. (Tr. 19 (emphasis added)). Considering O'Sullivan's impairments, the ALJ determined that O'Sullivan maintained the physical RFC to perform light work, including the ability to lift, carry, push, and/or pull up to twenty pounds occasionally and ten pounds frequently, and to sit, stand, or walk for up to six hours during an eight-hour workday, provided she were permitted to stand for two minutes after every thirty minutes of sitting. (Tr. 23). Additionally, the ALJ determined that O'Sullivan was able to frequently stoop, crouch, handle, and finger, and occasionally climb ramps and stairs, balance, kneel and crawl, but was unable to climb ramps or stairs or to be exposed to workplace hazards. (*Id.*).

In reaching this RFC assessment, the ALJ gave "significant weight" to the October 8, 2014 opinion authored by Balderman. (Tr. 33). At the time of Balderman's evaluation, O'Sullivan reported that she had suffered from arthritis for the previous three years.

(Tr. 320-22). She reported diffuse and constant pain that was partially ameliorated with medication, particularly prednisone. (*Id.*). O'Sullivan worked as a bookkeeper three hours per week and reportedly needed assistance to bathe and dress. (*Id.*).

Upon physical examination, O'Sullivan appeared to be in no acute distress, had normal gait, used no assistive devices, had a normal stance, and could walk on her heels and toes without difficulty, squat to 60% of full, get on and off the examination table, and rise from a chair without difficulty. (*Id.*). Musculoskeletal tests were normal, with stable and nontender joints, and no trigger points. (*Id.*). Neurologically, O'Sullivan had intact sensation and full strength in her upper and lower extremities. (*Id.*). O'Sullivan also had intact hand and finger dexterity and full grip strength bilaterally. (*Id.*). In Balderman's view, O'Sullivan's prognosis was "stable," and he opined that O'Sullivan had "minimal to mild limitations in kneeling, climbing, and prolonged walking." (*Id.*). He recommended imaging of her hips. (*Id.*).

The ALJ's RFC assessment that O'Sullivan could perform light work with certain specified limitations accounted for the mild limitations for kneeling, climbing, and prolonged walking identified by Balderman. (Tr. 23). According to the ALJ, Balderman's assessment was consistent with the record evidence, including treatment notes authored by her treating rheumatologist Sunita Chadha ("Chadha"), MD, and her primary care physician Geemson Oo, MD. (Tr. 33-34). The ALJ recognized that Balderman issued his opinion in October 2014 and that O'Sullivan continued to receive treatment for her impairments after that time. (*Id.*). According to the ALJ, she considered those subsequent records and O'Sullivan's subjective complaints, and she assessed greater restrictions than Balderman opined. (*Id.*). In doing so, the ALJ specifically considered whether the subsequent treatment notes evidenced any deterioration in O'Sullivan's condition or functioning and concluded that they did not. (*Id.*).

12

O'Sullivan challenges the ALJ's reliance on Balderman's opinion because it was issued before Chadha assessed a "working diagnosis" of fibromyalgia for O'Sullivan. (Docket # 7-1 at 18-21). O'Sullivan is generally correct that "an ALJ should not rely on 'stale' opinions – that is, opinions rendered before some significant development in the claimant's medical history," *Robinson v. Berryhill*, 2018 WL 4442267, *4 (W.D.N.Y. 2018), and that "[m]edical source opinions that are stale and based on an incomplete medical record may not be substantial evidence to support an ALJ['s] finding," *Davis v. Berryhill*, 2018 WL 1250019, *3 (W.D.N.Y. 2018) (alterations, citations, and quotations omitted). That said, "a medical opinion is [not] stale merely because it pre-dates other evidence in the record, where . . . the subsequent evidence does not undermine [the opinion evidence]." *Hernandez v. Colvin*, 2017 WL 2224197, *9 (W.D.N.Y. 2017) (citing *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order)). *Accord Morgan v. Astrue*, 2010 WL 3723992, *13 (E.D. Tenn.) ("[i]n every claim for DIB or SSI before an ALJ, some time will elapse between the date that a medical opinion about the claimant's condition is rendered and the date that the ALJ considers that opinion[;] [f]requently, new evidence about the claimant's condition will come to light during the intervening period of time[;] [t]he SSA's disability determination process would cease to function if ALJs could not rely on a medical opinion simply because some new evidence entered the record after the opinion was provided"), *report and recommendation adopted by*, 2010 WL 3723985 (E.D. Tenn. 2010).

O'Sullivan began treatment with Chadha in August 2011, at which time she was diagnosed with rheumatoid arthritis. (Tr. 461-62). At that time, O'Sullivan was working as an accountant on a full-time basis, and she complained of pain in her hands and wrists. (Tr. 469-70). In December 2011, O'Sullivan complained of "diffuse musculoskeletal pain and

13

stiffness." (Tr. 472). Her symptoms, which included diffuse pain in her arms, legs and knees, were largely alleviated with prednisone. (Tr. 475). By May 2012, O'Sullivan denied significant pain, swelling, or stiffness so long as she maintained a low dose of prednisone. (Tr. 340). O'Sullivan continued to work full-time until she was terminated in June 2012. (Tr. 50-52).

O'Sullivan did not meet with Chadha again until May 2013, at which time she continued to complain of joint stiffness and discomfort. (Tr. 343). In September 2013, O'Sullivan complained of pain "all over," with significant stiffness in her neck and paracervical muscles. (Tr. 351). At this time, Chadha suspected that O'Sullivan's "symptoms [we]re suggestive of myofascial pain, fibromyalgia." (Tr. 352). Chadha assessed that O'Sullivan suffered from "myalgia and myositis" and suggested that O'Sullivan try Flexeril or Cymbalta. (*Id.*). In March 2014, O'Sullivan continued to complain of diffuse myalgias and arthralgias, without significant joint pain or swelling. (Tr. 355).

O'Sullivan met with Chadha twice in 2015 and continued to complain of pain in her arms, wrists, hands, hips, knees, and feet, which was generally managed with a low dose of prednisone. (Tr. 368-78). During this time, O'Sullivan reported regularly going to the gym for exercise, which Chadha encouraged her to continue. (*Id.*). In 2016, O'Sullivan met with Chadha on three occasions and continued to complain of generalized pain in her feet and hips; Chadha noted that she had generalized tenderness and multiple trigger points to palpation during examination. (Tr. 380-98). In October 2016, Chadha indicated that the cause of O'Sullivan's "generalized pain remains unclear, and our working diagnosis is a formal fibromyalgia." (Tr. 398).

Although Chadha did not assess a "working diagnosis" of fibromyalgia until October 2016, two years after Balderman's October 2014 evaluation, the records demonstrate

14

that Chadha suspected that O'Sullivan suffered from myalgias pain in 2013, prior to Balderman's evaluation. Nothing in the record suggests that O'Sullivan suffered from more severe limitations after Balderman's evaluation. Rather, a longitudinal view of the record demonstrates that O'Sullivan experienced similar symptoms throughout her treating history, and that the subsequent diagnosis of fibromyalgia related to the same condition, not to any new or different impairment. In this case, O'Sullivan simply has not demonstrated that the record evidence relating to her subsequent diagnosis of fibromyalgia undermines Balderman's opinion. To the contrary, and as recognized by the ALJ, O'Sullivan's condition or functioning did not deteriorate after Balderman's evaluation. (Tr. 33 ("subsequent evidence does not objectively document any notable changes or worsening in [O'Sullivan's] status or functioning since [Balderman's evaluation]")).

Taken together, the record evidence does not demonstrate a deterioration in O'Sullivan's functional ability as a result of the working diagnosis of fibromyalgia that would render Balderman's assessment unreliable. Moreover, in assessing O'Sullivan's RFC, the ALJ discussed and explicitly considered medical records post-dating the medical opinion evidence and seemingly credited portions of O'Sullivan's hearing testimony.[4] (*See* Tr. 33 ("I have considered later records and the claimant's subjective allegations regarding her symptoms and functioning in assessing greater restrictions than [Balderman]")). Accordingly, "[t]here is no evidence that the RFC determination does not adequately account for [O'Sullivan's fibromyalgia], and [O'Sullivan] does not suggest that any specific additional limitations were warranted." *Kidd v. Comm'r of Soc. Sec.*, 2019 WL 1260750, *4 (W.D.N.Y. 2019).

---

[4] For reasons explained in her decision, the ALJ did not fully credit O'Sullivan's account of the functional limitations arising from her impairments. (*See* Tr. 23-26, 32-33). O'Sullivan does not challenge the ALJ's credibility determination.

15

In short, O'Sullivan neither points to any medical evidence suggesting that after Balderman's opinion was rendered her condition deteriorated causing disabling functional limitations, nor identifies any relevant evidence post-dating the medical opinions that the ALJ failed to consider. For these reasons, I find that substantial evidence supports the ALJ's RFC assessment. *See*, *e.g.*, *Ambrose-Lounsbury v. Saul*, 2019 WL 3859011, *3-4 (W.D.N.Y. 2019) ("[claimant] has not shown significant developments in her medical history following [consultative examiner's] opinion that render it stale[;] . . . [claimant's] only new ailment after [consultative examiner's] examination was the 'left ankle swelling'[;] . . . [b]ut the record does not evidence any limitation from that swelling that the ALJ did not account for in the RFC[;] [s]o the ankle swelling is hardly a 'significant development'"); *Sexton v. Berryhill*, 2018 WL 1835494, *7 (W.D. Okla.) (finding no error where ALJ relied on opinion evidence that was completed "before all of the medical evidence was in and [[p]laintiff] became more severe[;] . . . [h]ere, however, the opinions of the state agency physicians are relevant to the period to which they apply, and [p]laintiff does not identify any evidence of a subsequent deterioration in [p]laintiff's condition that was not reviewed and considered by the ALJ[;] [t]he ALJ expressly stated that additional evidence . . . was received and admitted into the record subsequent to the hearing and that he reviewed this evidence and considered it in his determination[;] . . . [b]ecause the ALJ independently reviewed and considered the post-2014 evidence, and [p]laintiff points to no credible evidence inconsistent with the RFC, the undersigned finds no reversible error in the ALJ's reliance on the agency physicians' opinions"), *report and recommendation adopted by*, 2018 WL 1858255 (W.D. Okla. 2018); *Morgan v. Astrue*, 2010 WL 3723992 at *13 ("[i]n this case, [p]laintiff has not shown that the additional objective evidence he cites was inconsistent with the opinions of [consultative physicians][;] . . . [p]laintiff has not explained how a review of

the new evidence he cites would have changed the opinions provided by [consultative physicians][;] [a]ccordingly, the [c]ourt cannot find error in the ALJ's decision to rely upon the doctors' opinions").

Nor do I find that remand is warranted because the ALJ's RFC assessment included more restrictive limitations than those opined by Balderman. (Tr. 33). In the ALJ's view, Balderman's opinion predated some of O'Sullivan's treating history and, although the ALJ did not find that the subsequent treatment evidenced any "notable changes or worsening," she nonetheless considered the subsequent information and O'Sullivan's subjective allegations when formulating the RFC. (*Id.*). The ALJ did not err in discounting Balderman's opinion on this basis or by including greater limitations in her RFC determination than those opined by Balderman. *See*, *e.g.*, *Catalfamo v. Berryhill*, 2019 WL 1128838, *2 (W.D.N.Y. 2019) (rejecting argument that ALJ improperly substituted his own lay opinion where ALJ gave "little weight" to two medical opinions and "imposed more restrictions than th[ose] two opinions suggested were necessary"); *Glab v. Comm'r of Soc. Sec.*, 2018 WL 3422062, *3 (W.D.N.Y. 2018) (ALJ did not err in "affording some weight to Dr. Miller's opinion in assessing [p]laintiff's RFC" where opinion was "fairly consistent with the overall medical evidence of record . . . [but] did not account for [p]laintiff's need to change positions periodically and avoid certain postural activities"; "[t]he fact that the ALJ's RFC conclusion was more restrictive in some aspects than Dr. Miller's opinion . . . does not establish that the ALJ was relying on his own lay opinion"); *Baker o/b/o Baker v. Berryhill*, 2018 WL 1173782, *2 (W.D.N.Y. 2018) ("[w]here an ALJ makes an RFC assessment that is *more* restrictive than the medical opinions of record, it is generally not a basis for remand") (emphasis in original). Accordingly, I conclude that remand is not warranted on this ground.

## CONCLUSION

After a careful review of the entire record, this Court finds that the Commissioner's denial of DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**. O'Sullivan's motion for judgment on the pleadings **(Docket # 7)** is **DENIED**, and O'Sullivan's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
　　　 March 12, 2020